Thank you, Your Honor, and may it please the Court. We're here on an appeal of a dismissal on a Rule 12b-6 motion. If you look at the record, you might have thought that perhaps we're at summary judgment, but this is a 12b-6 motion. I want to start by trying to make clear what this case is not about. Defendants have tried very hard to say that this is a case about a mere inactionable disagreement about the interpretation of data relating to overall survival, which clearly was highly material in this case, because the defendant's product was undergoing testing to try to show that it was superior to an existing drug, trastuzumab, which has been around for 20 years and has a well-established record as a successful and effective treatment against breast cancer. Given that there was an existing effective treatment against breast cancer, investors were obviously highly interested in knowing, not merely whether the drug was also effective, but whether it was, to quote a phrase, a better mousetrap. Because if you have a choice between buying a mousetrap that's worked for 20 years and has a long record, no safety problems, all the bugs have been worked out. Well, the primary case in point on statements, Your Honor, is they said that the interim overall survival data was trending positively as of February, just before they went to market and raised $126 million in a secondary offering. They said it again in May before the actual trend data was presented at ASCO. Well, when did they have the information about the Kaplan-Meyer curve? That's really the essence of the case, isn't it? Your Honor, that's certainly one of the key issues, particularly as to Cyanter. Did they need that for their submission of this thing to ASCO to determine whether or not it was effective? Whether it could be presented at the meeting? Your Honor, I think that drug companies have discretion in what they choose to present to ASCO or not. ASCO is not a government regulatory body. I understand, but you've got to meet ASCO's standards, and the question is whether they knew about the bad Kaplan-Meyer curves back in February. Your Honor, let me give you a couple of reasons as to why. Certainly on this record, there's a strong and compelling inference that they did. First of all, all the data that was disclosed at ASCO was from a data set that was locked in October of 2018. We're talking about them discussing the data for both PFS, progression-free survival, and overall survival, in February of 2019, four months later. Their own statement said that they were tracking the OS data. They went and told the market, we have positive trending data. The trend is positive, versus just using that. You're being selective there, because both in the press releases and the call and the filings, there's a lot of information that's out there. The discussion of the OS is just replete with cautionary statements. It seems to me they go out of their way to say this data is preliminary, it's subject to change, it can go, the tests are ongoing. And that, it seems to me, is the prudent thing. I mean, this is typical. For example, the achievement by a text e-mail, or whatever it is, to the primary endpoint of progression-free survival, does not indicate whether the co-primary endpoint of overall survival will be achieved. And it seems to me that that's about all you can say about OS survival, as opposed to progression-free survival, because you don't know the endpoint of OS survival until you track patients for a long period of time. And that hasn't happened here, and so the company says, look, we need to alert people that this is simply, with respect to OS survival, this is simply preliminary. And it's subject to change, and it's fluctuating. And given the fact that OS survival rates are not going to be known for a long, long time, it seems to me only prudent for the company to separate progression-free survival and OS survival, and make particularized comments with respect to each. Your Honor, let me try to address your comments head-on. I have concerns, but I don't think appreciated the underlying facts. Let me just briefly finish in 15 seconds answering Judge Gibney's question, how did they know of the data? The only trend data that's in the record is the Kaplan-Meier curve data. There's no other trend data that they cite to. They have the best lawyers in America on the defense side. They can't cite a single other trend data. And they said the trend is positive. If they didn't have any trend data at all, then they shouldn't have been opening their mouths. If they did have trend data, the only trend data was bad. So your point is that while they may have put all these caveats in there, if they say, well, it looks really good, but don't say the damning evidence about the Kaplan-Meier curves, that it's an omission that is fatal to their defense. I think I can try to address both of your comments in the same blow. Your Honor, Judge Wilkinson, they were not silent on the OS data. They put that subject squarely in play. They say we have OS data, we're watching it, and the trend is positive versus the established trastuzumab. That was music to any investor's ear. And of course, you always have risk that when you complete the analysis, the data will change. But when you tell people things are looking great, that's material. They didn't say that. No, Your Honor, and thank you for correcting me. That's your glass on it. No, Your Honor, let me be very precise, and I appreciate your correction. And I want to focus exactly on the words they used, because the words they used are important. They said that the trend in the OS data is positive for margituximab, and that effectively meant positive for margituximab versus trastuzumab. What that means is, okay, they're saying, if you look at where the data is going, the best data we have, where is it going? It's going favorably to margituximab. Now, what we've alleged in the complaint, and this is the only evidence on trend that there is in the complaint, is that Kaplan-Meier analysis is the gold standard, is the method for looking at preliminary OS data to see where it's going. There is a recognized scientific method for taking preliminary data and making an assessment as to where the trend is. It doesn't mean that the trend is set in stone and nothing can happen, but it's the way you do it. It's Kaplan-Meier data. So, if you look at the Kaplan-Meier curve data, it's in our brief, it's in the record, you see the separation in the curves. That separation, you know, the trend, you know, is margituximab or trastuzumab separating favorably from its competitor? You could be a fourth-grade science student and read the Kaplan-Meier curve to say that... A reasonable investor would know the difference between progression-free survival and overall survival, and they would know that you can come forward with evidence on progression-free survival because that has a five-year or whatever end point, but overall survival is by its very nature tentative until it's over a longer period of time, and an investor would know that. The one thing I want to point out here is that, I mean, with breast cancer, it's caused so much anxiety and it's caused so much suffering, and there's a real need for treatments and improved treatments, and there's a danger here that the treatments that are really needed to reduce this anxiety and suffering that goes along with this terrible illness are going to be kept off the market because those who are doing the treatments are likely to know that almost anything is going to be met with a securities fraud lawsuit, and the question that I have is, this is the very danger that the Supreme Court and the TLAB's decision was concerned with, and it's the very danger that Congress was concerned with when it passed the PSLRA. This court has been concerned with that danger just two weeks ago or whatever, Judge Heitens and myself dealt with some of these same concerns, and it seems to me we are in danger of really going against the grain of what Congress wanted to achieve with the PSLRA and what the Supreme Court wanted to achieve with TLAB's, and what our precedent over a long period of time has tried to achieve, and that is you don't want to discourage innovation. In an area which is in need of good treatments because of the suffering it causes in particular, and these suits can keep innovation off the market, and that seems to me a danger here. Your Honor, if you read every Supreme Court opinion on securities fraud cases, they will echo to some extent the concerns Your Honor has raised, but they have also emphatically, repeatedly, I would dare say over a dozen times, said that private enforcement of the federal securities regulations is a vital supplement to SEC and regulatory action. There is a heightened standard with respect to one element, cyander, and I might ask the Court's indulgence for a little extra time just to address the cyander element as to which there is a heightened standard, but here with respect to innovation, and I lost my mother-in-law to breast cancer. I'm not insensitive to the importance of having new treatments, but drug companies do not have carte blanche to say whatever they want about drugs that are in development. There is no exception. If they were going to say whatever they wanted, there are almost a dozen cautionary statements here that indicate that the top line could change, that it's all in fluctuation, that it's all open. That's not saying whatever they want to say. Your Honor, let me address the legal standard, which is applicable. The legal standard is whether the statement that the data is at this moment in time, the data we have, the data from the October 2018 data set, is it fair to say that that data was trending positively? Is that a material misstatement? The standard that this Court and the Supreme Court have articulated is, would a reasonable investor... You have to consider that in the context of the cautionary statements and the entirety of the information they put out. I agree, Your Honor, but the standard is, as a matter of law, could the district judge below say that the statement, which falsely characterized the trend data, was immaterial as a matter of law? When the ASCO data and the Kaplan-Meier curves came out, they were certainly material enough for macrogenics to put them into a 15-minute slide presentation at the World's Premier Cancer Conference. When those Kaplan-Meiers hit the wire, within hours, the stock of macrogenics, they lost hundreds of millions of dollars of market cap. Your Honor, you are correct. We don't want to stifle innovation. But the law is very clear. Congress says you can say nothing about your efficacy data. They didn't have to say anything about this data. They came this way and presented everything. But if you're going to open your mouth, you cannot cherry-pick. And all the cautionary language in the world, oh, the data may get better, will not cure a false statement as to the data now. May I ask you a question about Cyanter? Yes, sir. Do they have to approve Cyanter for the individual defendants as well as the corporation? The Cyanter of the individuals will be imputed to the corporation. There's quite an academic debate as to whether you can have Cyanter imputed to the corporation and not to any named individual. In the case, I would say yes. But I think in this case, Cyanter is clearly pled as to both. What facts are there that show that these – I understand that as for the corporation, they had all kinds of people involved in the SOFIA study, including some sort of vice president for clinical development. So the corporation may have had Cyanter. But what about these two guys who made the statements? Well, if the guys who made the statements, the defendants, Dr. Koenig and the other gentlemen, if they opened their mouths to say the data is trending positively and they hadn't looked at any data, that would be a grossly reckless statement to just tell investors, oh, we think it's good because I think it's good. You have to have evidence when you're telling people serious, concrete data about clinical evidence. Certainly, the presumption, the reasonable assumption here, the compelling assumption, is that they did have this data. Well, this is sort of like the core operations theory, isn't it? It's partly core operations, but it's partly the defendants' own statements. It's in the records in our brief. When they say, we are tracking the data, how can you say – we take them at their word. Well, doesn't the Fourth Circuit say you can't use the core operations theory to create Cyanter? Your Honor, our first argument is that the defendants themselves say that we were tracking the data. I don't think there's any serious argument that the Kaplan-Meier data would have been performed. And in fact, if they said they were tracking the OS trend data, again, on this record, the only OS trend data that exists is the Kaplan-Meier data. They haven't offered any other alternative analysis. As far as we know, there still is no alternative. There's no Wilson-Son-Seedee analysis that competes with the Kaplan-Meier analysis. So if they had any data on trends, it would have been the Kaplan-Meier data. They said they were tracking it. They characterized it as positive. They put it in play. And just again, in answer to Judge Wilkins' question, they could have said nothing. They should have said nothing. But the law of the land and of Congress, which we all live under, is that you cannot cherry-pick that. They didn't need to say time and time and time again that these OS figures are purely preliminary, that they could change, they go out of their way. They didn't need to say any of that either. You say, well, they didn't need to say that they were trending positive, but they didn't need to put in cautionary statement after cautionary statement after cautionary statement, none of which adhered to their advantage. In fact, it was to their disadvantage. And the question we are required to ask under TELADS is, is the culpable explanation more likely than the innocent explanation? And why in the world would a company that is bent upon deception go out of its way to say, we're not overselling the OS results because time and time again, both in the press release, in the call, in the filing documents, they're all replete with cautionary statements. And I say what I'm concerned about ultimately is that with security fraud cases like this, which are open to very large judgments, I worry that treatments that could be of enormous benefit to people who are, to women who are suffering from a devastating condition, that people aren't going to go on the market. Now, your response is, well, they can go on the market as long as they do it honestly. But, again, this isn't just one cautionary statement. It's not two. It's not three. It's not just one forum. It's not just in a call. It's not just in a press release. It's in all of them, every single one of them. Your Honor, let me briefly address your question and then give opposing counsel an opportunity to respond. Let me try to give a very common sense or a leg of an analogy, which I hope is persuasive. You get a call from your child's teacher. He says, it's only halfway through the semester, but your kid's doing well. I like where it's going. We'll see where the final exam is. But I like where it's going. Is there a material difference between a teacher saying that and saying, Judge Gregory, the interim data is in, and I'm afraid it's not looking good. The data may change. It can always correct. Things may come up. But things aren't on a good track. If you think that there's no material difference between saying those two things, then I think you'll decide the case a particular way. If you think there is a difference between saying those two things, I think you'll decide it another way. My client, a pension fund, City of Baton Rouge, invested a large amount of money in this stock. They bought it in an offering, where the stock price went up by basically two and a half times when they came out and misrepresented the data. They took a $10 stock, popped it up to over $20. They did it based on false and misleading statements. It wasn't an accident. They weren't required to open their mouths. They did open their mouths. They did so in a false way. And on this record, pre-discovery, we respectfully submit that the evidence is clear that they had actual knowledge of the real data, that that was the only data that there was. It was adverse. They made a false statement. They can come back at summary judgment and say they're innocent. But at the pleadings, we respectfully submit that this meets the higher test that Congress has set. I'll yield, and I appreciate the Court's indulgence. We're out of time. Thank you, Your Honors. Thank you, Mr. President. Ms. Locker? Thank you, Your Honors, and may it please the Court. There are three independent grounds on which you can easily affirm. First, under Omnicare, because Dr. Koenig's statements interpreting the interim OS data were non-actionable opinions. Second, under this Court's decision in Paradise, because, as Judge Wilkinson said it much more articulately than I could have, Dr. Koenig's statements were absolutely cautionary and filled with warnings of the very risks plaintiffs complain about. And third, under Scienter, I'd like to start by focusing on Dr. Koenig's cautiously optimistic statement interpreting the OS data, overall survival data, as trending positively. But what if he knew about these curves? I'm going to go right to that. Doesn't he have an obligation to tell them that if he knew about it? No, Your Honor. Now, Mr. Frederick says, and he said it in his reply brief, he said it here this morning, that the KM curves were the only trend data and that the curves were trending against March tuxedos. But plaintiff did not allege this in its complaint. He didn't allege that the KM curves were the only trend data.  I'm going to look at pages 19 and 39 for that to see what they actually alleged about the KM curves. And they didn't argue that below. And there's a reason for this. Even setting aside those problems, a fourth grade science student can tell that that's demonstrably false. And the quickest way to see this is to turn to page 140 of the joint appendix. And if the court prefers, I actually have laminated copies, enough for the panel and enough for opposing counsel. It is the key piece of evidence in this case. It's incorporated by reference. Plaintiff even pasted a copy of this in their brief, although chopped off a very significant part of this slide. And, again, we have copies. We can hand them to the courtroom deputy laminated. But if not, you can turn to page 140 of the joint appendix. Now, what does this slide show? This slide has all the interim OS data. It's the slide that Dr. Rugo presented at ASCO in June of 2019. There are three key measures of the efficacy of margituximab right on this slide. And I'm going to point them out for the court, if I may. I'm going to start. There's a box on the left, which is the full intent to treat population. Box on the right, which is that pre-specified subpopulation with the gene mutation epithelial. What are these three measures of efficacy? I'm going to start from the bottom of the box and go to the top. First, hazard ratio, labeled HR. Second, median overall survival, labeled as median OS. And third, aggregate survival data, denoted as number of events or deaths. All three were positive in favor of margituximab. Let me repeat that. All three were positive in favor of margituximab. So the KM curves were not the only data available at the interim OS review reflecting how the data was trending. The curves were one piece of information of a much larger picture that Dr. Koenig had to interpret, determine how the data was developing over the course of the trial. The KM curve is no more a trend data or information than looking at the hazard ratio, the median OS, and the aggregate survival data, again, all of which was trending positively on behalf of margituximab. Well, but isn't this level, obviously I dropped out of science before fourth grade, but isn't this more of a summary judgment issue? No, Your Honor. This slide, this slide, no matter. But to understand this slide, you need to have some, I need to have a very bright attorney explain it to me. Okay, but then why do you take plaintiff's interpretation of the data over defendant's interpretation of the data? Because we're at a motion to dismiss. No, because, thank you for that question, Your Honor. So plaintiff has, plaintiff alleges that the KM curves were trending against margituximab. I'm going to get to that in a moment. You might think it's a little summary judgment. But plaintiff has conceded in their opening brief at page 32 that that's just their interpretation. That's a concession, just their interpretation. And what the cases say, and I'll refer the court to the Second Circuit decisions in Sanofi and Kleinman, the Third Circuit decisions in Ameren and Pfizer, and district court decisions from the First, the Second, and this circuit in Cario Farm, AstraZeneca, and Shaw, that a difference of opinion, a difference in the interpretation of scientific data is insufficient to establish falsity. It's nothing more than a disagreement, a scientific disagreement. Yeah, they make two points. I mean, all of those decisions that you point to and all of the Fourth Circuit decisions and the telehealth decisions, they were all pleadings decisions. And the idea of leaving it for summary judgment, those decisions were pleadings decisions. All of them, Your Honor, yes. All of them. Each and every one of them was a pleading case. And you have to establish in the pleadings that the culpable evil explanation is at least as compelling as the innocent explanation. And when you get to the point of interpreting very complex data about which I suppose reasonable minds could disagree, but it's certainly a reasonable interpretation that you've put forward, whether it's ultimately correct, it is certainly reasonable. And the disputation of that is often a matter of opinion. But we've essentially given the number of cautionary statements, and I haven't seen many cases where a company was looking for capital or whatever where they have gone out of their way and bent over backwards to say this is nothing but preliminary data. And if we say this makes a culpable explanation more likely in light of this slew of cautionary statements, think of the number of securities fraud cases that are going to be going against the grain of our precedent, the Supreme Court precedent, what Congress sought to establish. And in particular, in this particular area of public health, as I say, that is the last thing you want to do is to shut off innovation, innovative treatment that could bring some relief and alleviation of suffering, which is of society-wide concern. Thank you, Your Honor. I want to, I'm going to actually skip over my argument regarding warnings because you have articulated it better than I can. I want to address one comment by Judge Gibney, and then I'm going to turn to Scienter, if I may. Judge Gibney, the most, and I have a lot of arguments as to why, although they're going to sound like summary judgment to you, but these are all pleading cases, and I just want to point one thing out. At month, when you look at JA-24 and you look at month 24, which is the point at which plaintiffs say that the KM curves were trending against margituximab, you have 14 patients, a total of 2.6 of the patient population at that point. You want to talk about interpretation. Some experts, including Dr. Rubo, who spoke to these slides at ASCO, would say 14 patients, 2.6 of the population, that's anecdotal. You can't discern a trend from 14 patients and whether one dies or one doesn't die. So what we have is, at most, even if you credit plaintiffs' interpretation of the data, even if it was supported by experts, and it's neither, not valid, not supported, but even if it were, the most you have is information that's mixed. This is a concession by plaintiffs, and I would refer the court to JA-385 and 86 of their opening brief. That concession, that the data is mixed, should end the case. Because under Omnicare, as we know from the Supreme Court, an opinion is not false or misleading simply because you have a fact that, quote, cuts the other way. Why? Because, as the Supreme Court explained in Omnicare, investors understand, they don't expect that every fact is going to support an issuer's opinion. These are quotes. Investors are aware that some of the underlying facts may be in tension with the issuer's opinion. So, at most, we have a fact that cuts the other way. It's mixed. That's plaintiff's concession right there. Again, plaintiff's concession that this is really their interpretation of the data. So, with that, I'd like to turn to Scienter for a moment. The essence of plaintiff's theory of Scienter here is that from roughly February to June of 2019, defendants concealed the KM curves because they purportedly would have shown that the data was trending against March Tuxen map. This theory makes no sense, and it's not supported by particularized facts. And I would say, Your Honor, that no, the complaint does not adequately allege that defendants had access to the KM curves as of February of 2019. You can look at the underlying data, the hazard ratio, the median OS, the aggregate survival data, without having the KM curves. But even if you assume they had access to KM curves, Scienter would be woefully insufficient. First, it's simply implausible that Macrogenics, a biopharmaceutical company of limited resources, would spend two and a half years from February of 2019, two and a half years. You can find that at plaintiff's opening brief, page 33, note 13. And millions and millions of dollars to complete a trial they thought was unlikely to succeed because the data was trending negatively. It wasn't on track to meet its end point, so says the plaintiff. That's the lesson of Casarelli. Second, and this is even more implausible, according to plaintiff, Dr. Koenig provided his opinion of the data, that it was trending positively, knowing that opinion was false, or with total disregard of the truth, but knowing that Dr. Rugo, a preeminent expert from UCSF Medical School, and the independent, I'm going to repeat that, independent lead investigator, in a couple of months at ASCO was going to give her own interpretation of the very same data in front of an audience of, and this is plaintiff's words, premier oncologists and oncology researchers of the United States. And that's at paragraph 65 of the complaint, JA37, and plaintiff's allegations and argument that this is what Dr. Koenig knew that Dr. Rugo was going to present in a couple of months is at plaintiff's opening brief at 42 and paragraphs 58 to 59 of JA35. So let's step back and think about what plaintiff just said. Dr. Koenig lied, knowing that his lie was going to be exposed in a couple of months in front of an audience of the top oncologists in the country who ultimately decide whether to prescribe a new treatment. Well, I don't think he's saying that the doctor lied, he's saying the company lied. Well, it was the doctor, Dr. Koenig, who said that the data was trending positively. In fact, he said it on the February 6th. Was he part of the investigation team? Koenig was not, was he? The investigation team had some special guy that was... Well, he is a scientist, he's a doctor, he's the CEO of the company. So no, he was not part of the unblinding team, but yes, I mean, he's ultimately responsible. I may be misunderstanding your comments. Oh, go ahead. But it was his comment on February 6th, it was his quote in May 15 press release, and he owns it, right? Did he do the presentation at ASCA? No, Dr. Rubo, the independent investigator, gave her own interpretation of the data, and that's why I'm saying, he's sitting there saying it's trending positively based on the information I provided to you. Well, you asked why he would do that. The answer is they were trying to raise hundreds of millions of dollars to issue stock. Right, but this court, Gates, Casarelli, Janneys, and Ottman, says that a motivation shared by all companies, such as raising capital, those are four Fourth Circuit decisions, this court, that's not enough. Were those cases, in temporal terms, was the misstatement made as close to the stock issuance as it is here? The alleged misstatement was made on February 6th, the offering was on February 13th. A week later. Right, but in Gates, and forgive me, I'll get the name of the other case, the alleged misstatements were in the offering documents. I mean, you talk about temporal proximity, that's what happened in Gates and Casarelli, sorry. The alleged misstatements were in the offering documents. So temporal proximity is not going to bring you over the line. It still adds little to inference, and that's all they have in this case. No allegations of insider trading. Let me just also say, yes, of course. Is it your position that the sole justification for, that would justify the statement that is trending positively for this experimental drug, these three boxes that you talked about, and the KM curve? Yes, Your Honor. That's the sole basis for your, at this point, for motion to dismiss, that's the sole basis that was justified in saying it's trending positively for this drug. Is that right? There's one other point. Okay, okay. But yes, it's those three, and the KM curves, because the hazard ratio summarizes. That's why I said, yeah, the KM and the three boxes. Is there anything else? Yes, one other thing. Okay. Dr. Koenig was not the only one who thought that the data was trending in the right direction. At ASCO, Dr. Rugo said that it was too early, her comments reflect that it was too early to draw from the KM curves because of the expected immune delay. I'll explain that in a moment. The expected delayed immune response from margituximab, which is an immunological drug, meaning with these immune-compromised patients, these cancer patients for whom other treatments have failed, they're immunocompromised, we all know about that. So she said she believed that the OS data was going to exceed the PFS benefit. I'll give you a cite for that in a moment. The PFS benefit, as Judge Wilkinson mentioned earlier, the progression-free survival, met its end point. It was statistically significant positive in favor of margituximab. This is that page at joint appendix 299, which is referenced in paragraph 76 of the complaint, and therefore this court can incorporate it by reference. So Dr. Rugo herself said she believed the data was heading in the right direction, and, of course, she's independent. So this is one of the exhibits you attached to your motion to dismiss? Yes, Your Honor, and it is incorporated by reference. It's incorporated by reference into your motion to dismiss, but can the court consider that in the motion to dismiss? Absolutely. It is no different, Your Honor. It is incorporated by reference, and it is no different than the analyst report that was incorporated by reference in Casarelli, in which this court held that it supported an inference. What was in the analyst report in Casarelli was repeated by an analyst. Forgive me. In Casarelli, there was an analyst report that repeated the company's statement that it wasn't going to disclose the end point because of competitive reasons, and this court, by incorporation by reference, accepted that as a fact to support an inference of non scienter, of non culpable reasons for the company's decision not to disclose the end point. This is no different. This is an analyst report plaintiff cited at paragraph 76 of its complaint. I think it's JA42, paragraph 76, and this court is incorporated by reference. This court can accept the facts as true. Just very quickly, this is not a close case. You know, the company issued warnings underneath Janney's and Triangle that cuts against an inference of scienter. There's no allegations of insider trading under PEC and K12. That, too, is inconsistent with an inference of scienter, and when you take TELAPS as a whole, TELAPS as a whole, and you view all of the allegations holistically, the inference of innocence is much more plausible than an inference of nefariousness. Ms. Locker. Yes. Scientific significance, because we're talking about this is science, and these biopharmaceutical experts know what they're doing, but in terms of scientific significance, if you, and I'm saying if because this is a record, you stated you needed 385 events to be significant in making any finding as to OS, but when you come out knowing you only have 158, which is 41% of that goal, but you said there's a trend that's positive, but isn't that against the science? The science says you need this mark to make anything significant. Is that problematic that you make a statement that's forward-looking at that point when you know, wouldn't that sort of make people think, oh, it must be something about this study right now that notwithstanding they're not where they're supposed to be to make a scientific significant statement, is that important in this case? No. Okay, tell me why. Let me say why. Sure. Each one of the decisions that we cited, Sanofi, Kleinman, Pfizer, Ameren, Carioform, it is typical for companies to disclose interim data, promising, encouraging, spectacular actually, robust study results. But that's why Dr. Koenig said, and here he said it not just in SEC filings, he said it, and I'm going to give you exact quotes and insights for it, among other things, because it's at pages 11 to 15 of our brief, we just don't have, this is when he said trending positively. Dr. Koenig said, quote, we just don't have enough events yet to be able to have significance here, so we'll continue to follow that. Quote, the number of events were small, and again, we'll just have to wait with time to see where that goes. Quote, it's too early to evaluate the secondary primary endpoint to overall survival as OS continues to improve. Could not have been clearer. In fact, if you look at Plankett's own complaint, they said everyone understood, this is paragraphs 55 to 59 at pages 34 to 35, everyone understood there was no statistical significance. It was interim, and he actually said, in one of his quotes, there's only X, I don't remember the exact number, Your Honor said it, there's only X number of events. There's no statistical significance. So with that, I'd just like to leave you with two thoughts. Number one, there's three separate grounds on which this court can affirm, and with the following. In Casarelli, this court recognized the danger of inferring Scienter every time a pharmaceutical company that was trying to raise funds issued a bullish statement. It would, in this court's words, choke off the lifeblood of innovation in medicine by fueling frivolous litigation. Dr. Koenig's statements were hardly bullish. They were cautious, they were accompanied by specific warnings, and they accurately described the state of the interim data. It was his best assessment and interpretation, and Omnicare says that a different interpretation is insufficient to establish that it was misleading or false. If you have no further questions, thank you, Your Honors. Thank you, Counsel. Mr. Frederick, do you have some time reserved? Your Honor, the Microtax Counsel and I agree on one thing, this is not a close case. She says that if you look at that slide on the Kaplan-Meier curve, there are three datas which show the trend. That is simply false. The hazard ratio and the median OS data are a snapshot of what all the data looks like over time. It's like saying the speed of the car as it approached the intersection in the preceding 500 feet was 30 miles per hour. But what does it say about the trend that the car was speeding at? It says nothing about the acceleration. Nothing in the median data will tell you whether the car, when hitting, to use my analogy, whether it was accelerating recklessly into the intersection and it hit the intersection. I don't understand what recklessness has to do with this in light of the cautionary statements. But when we're talking about Sienter, we're talking about civil mens re, which is generally thought to be knowing or willful or something like that. But it's a civil mens re situation. Looking at this record as a whole, these are not evil people. There's an accurate and legitimate basis for what they're saying. Even if you don't agree with it, there is some scientific validation for what they're saying. Your Honor, with respect, can I address that? Excuse me. But does it really rise to the level of Sienter, which is a mens re kind of standard? I would think that we would be literally stopping medical science in its tracks in this vitally important area if we let this case go past the pleading stage. That's what's at stake, stopping medical science in its tracks when a case this thin would go forward. Your Honors, let me go back to the fundamental point, which I think Judge Wilkinson, with all due respect, is misconstruing, where I started my argument. The only trend data is looking at the Kaplan-Meier curve down. It's like if you're asking, is Aaron Judge off to a hot start? What's the current trend in July? Counsel, there's a lot of room for dispute about this. Your Honor, but let me respectfully say that counsel has misrepresented our argument. Let me clear it up in one respect. There may be some other data that they haven't yet showed us or put in the record that says, oh, there's some other different analysis than Kaplan-Meier that's better trend data. I don't know. We haven't done discovery. We haven't seen their expert witnesses. What we have said in the complaint is the only trend data that's in the record, the only trend data that we are aware of, maybe it's out there somewhere, based on our due diligence, the only trend data is the Kaplan-Meier data. That trend was not positive. It was negative. You can't say that the trend is going up when it's going down. Was there any insider trading here? Yes, by the company. It sold $126 million worth of its own shares at more than two and a half times the stock price six days earlier. And let me just also say in terms of their alternative trend data, there is not a shred of evidence that Dr. Rugo, the independent analyst, ever said that the OS data trend was positive. If you read the record, and I beg the court to read the record carefully, what Dr. Rugo said or was quoted as saying by analysts was, well, the PFS data is good. And so based on the PFS data being good, I expect the OS data to be good. That's characterizing, that's saying I'm making an assumption about where I think the OS data is going because I'm assuming a correlation. But that is not saying that the OS data itself is positive. That's why you do the studies. That's why the FDA does the studies because they need to see the data. They don't want to have some theory that, oh, because of X, we can assume Y. They say, let's test Y. Let's test the OS data. The FDA made them test the OS data. It was a co-equal primary endpoint. It was critically important. The only reason why they approve drugs on PFS data is because you get the PFS data earlier. Everyone really wants to know what's the overall survival rate. Is it going to be better? That's what investors were ecstatic about. And they pulled the rug right out from under them. This is not Casarelli where the allegation was, well, you failed to tell people that your study design was ridiculous and would never work. And then you have the argument, well, why would you spend millions of dollars on a study design that you knew was wrong? Here, they had a study design. It was a good study design. You have to do the study to get the approval. Unfortunately, the data didn't pan out. There's nothing irrational or implausible here. And with all due respect, inferences of sciatica and recklessness have to be inferred from the record. We don't have the benefit of looking into the computer of the drug dealer pre-discovery. But the classic way of proving sciatica is, did defendants have access to information? Not that cuts some other way. This isn't like your matrix where, oh, there's some junior lawyer who says this may be illegal and I have five partners all saying it's fine. This is the only data in the evidence, the Kaplan-Meier data, directly undercutting the statement that the data was plausible. That's the only data. We don't even have a junior associate saying, oh, I have a different method of doing it. It's the only data. The data was going down, not up. This is, again, we respectfully agree this is a clear case. We haven't won on summary judgment, but we should certainly be entitled on the pleadings to go forward. I'm happy to answer any other questions the court has. Thank you, counsel. Thank you, Your Honor. Thank you, all of you. And as I said before, we can't come down and greet you as we'd like to, but know that we appreciate your arguments and wish you well. Be safe. Thank you. Thank you, Your Honor.
judges: Roger L. Gregory, J. Harvie Wilkinson III, John A. Gibney Jr.